## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| Julia Cavazos, | 15001 35th Ave. W, Apt. 12202 Lynwood, WA 98087 | ) ) ) ) |
| Nancy Cisneros, | 2220 Broadway, Apt. 2 Everett, WA 98201 | ) ) ) |
| Debra Cicalo, | 435 S. Isabella Rd. Mt. Pleasant, MI 48858 | ) ) ) |
| Darrell Coon, | 5637 Lawndale Rd. Saginaw, MI 48604 | ) ) ) |
| Elizabeth Douglas, | 6326 Mount Palomar Ave. Las Vegas, NV 89139 | ) ) ) |
| Wanda Ellis, | 15930 Zuehlke Rd. Albion, MI 49224 | ) ) ) |
| Eligah Bear Fisher, | 4621 Makwa Dr. Hersey, MI 48639 | ) ) ) |
| John Bear Fisher, | 4609 Makwa Dr. Hersey, MI 48639 | ) ) ) |
| Daniel J. Fowler, | 301 Hanchett St. St. Charles, MI 48655 | ) ) ) |
| James A. Fowler, | 1893 Wood St. Saginaw, MI 48602 | ) ) ) |
| Joey D. Fowler, | 13725 W. Townline Rd. St. Charles, MI 48655 | ) ) ) |
| Rick A. Fowler, | 1265 N. Main St. Saint Charles, MI 48655 | ) ) ) |
| Roy Fowler, | 1113 Chesaning St. St. Charles, MI 48655 | ) ) ) |
| Dale L. Fowler, Jr., | 526 Hanchett St. St. Charles, MI 48655 | ) ) ) ) |

Civil Action No._____

**PLAINTIFFS' COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

|                    |                          |     |
|--------------------|--------------------------|-----|
|                    |                          | )   |
| Connie Freiburger, | 3277 1st One #7          | )   |
|                    | Mims, FL 32754           | )   |
|                    |                          | )   |
| Michelle Garvey,   | 4125 Old King Rd.        | )   |
|                    | Saginaw, MI 48601        | )   |
|                    |                          | )   |
| Jackie L. Gibbs,   | 5502 East Morris         | )   |
|                    | Mt. Morris, MI 48458     | )   |
|                    |                          | )   |
| Angela Gomez,      | 1402 Lamson              | )   |
|                    | Saginaw, MI 48601,       | )   |
|                    |                          | )   |
| Andrea Gonzales,   | 3189 Mylsylvia Dr.       | )   |
|                    | Saginaw, MI 48601        | )   |
|                    |                          | )   |
| Mary Lou Gonzales, | 9815 Holly Dr. #A112     | )   |
|                    | Everett, WA 98204        | )   |
|                    |                          | )   |
| Dennis L. Gould,   | 500 Adams Rd.            | )   |
|                    | Saginaw, MI 48609        | )   |
|                    |                          | )   |
| Gerald Gould,      | 1395 Ramblewood Dr.      | )   |
|                    | East Lansing, MI 48823   | )   |
|                    |                          | )   |
| Harold Gould,      | 1050 E. River Rd.        | )   |
|                    | Mt. Pleasant, MI 48858   | )   |
|                    |                          | )   |
| Celeste Hamner,    | 14278 Elmhurst Dr.       | )   |
|                    | Sterling Heights, MI 48313 | ) |
|                    |                          | )   |
| Linda Haven,       | 5392 Elm St.             | )   |
|                    | Standish, MI 48658       | )   |
|                    |                          | )   |
| Dolores Hernandez, | 8874 E. Pickard Rd.      | )   |
|                    | Mt. Pleasant, MI 48858   | )   |
|                    |                          | )   |
| Dolly Holzhausen,  | 3831 Easton Rd.          | )   |
|                    | Owosso, MI 48867         | )   |
|                    |                          | )   |
| Esperanza Jaquez,  | 2735 Tatham              | )   |
|                    | Saginaw, MI 48601        | )   |
|                    |                          | )   |
| Sue Kusowski,      | 3070 E. Verne Rd.        | )   |
|                    | Burt, MI 48417           | )   |
|                    |                          | )   |

| | | |
|---|---|---|
| Don Lown, | 1850 Seminole Ln.<br>Saginaw, MI 48638 | ) |
| Kenneth G. Lown, | 210 Herlil Circle<br>Carenco, LA 70520 | ) |
| Donette Maney, | 3265 Coolidge Hwy.<br>Rochester Hills, MI 48309 | ) |
| LuAnn H. McNally, | 526 Hanchett St.<br>St. Charles, MI 48655 | ) |
| Margaret Moncado, | 2815 Douglass St.<br>Saginaw, MI 48601 | ) |
| Alice Moore-Barton, | 691 E. Weidman<br>Mt. Pleasant, MI 48858 | ) |
| Gloria Narvais, | 3920 Miigwan Ln.<br>Mt. Pleasant, MI 48858 | ) |
| Mickey Nieto, | 1908 Glenwood<br>Saginaw, MI 48601 | ) |
| Annette Ott, | 6760 Eaton Rapids Rd.<br>Albion, MI 49224-9302 | ) |
| David Otto, | 12924 Erie Rd.<br>Albion, MI 49224 | ) |
| Donulus Otto, | 15930 Zuehlke Rd.<br>Albion, MI 49224 | ) |
| Patrick Otto, | 2406 Intertown Rd.<br>Petoskey, MI 49770 | ) |
| Bernardino Perez, | 1827 Woodland Dr.<br>Mt. Pleasant, MI 48858 | ) |
| Feliz Perez, | 135 E. Warsau Ave.<br>Mt. Pleasant, MI 48858 | ) |
| Simon Perez, | 6254 Longmeadow Blvd. S.<br>Saginaw, MI 48603 | ) |

| | | |
|---|---|---|
| Lawrence Peters, | 5841 W. 12 Rd. Mesick, MI 49668 | ) ) ) ) |
| Judy M. Potter, | 2496 Sue Ann Ln. Flint, MI 48507 | ) ) ) |
| Sally Quiroga, | 3840 N. Hartford Dr. Saginaw, MI 48603 | ) ) ) |
| Sylvia Quiroga, | 2343 N. Bond Saginaw, MI 48602 | ) ) ) |
| Faye Roby, | 15524 U.S. Highway 23N Millersburg, MI 48759 | ) ) ) |
| Andy Shuler, | 19087 W. Brant Rd. Brant, MI 48614 | ) ) ) |
| Bryan Shuler, | 11946 Baumgartner Rd. St. Charles, MI 48655 | ) ) ) |
| Alton Smith, | 251 W. Townsend Rd. Twining, MI 48766 | ) ) ) |
| Delores Smith, | 6326 Mount Palomar Ave. Las Vegas, NV 89139 | ) ) ) |
| Mary Ann Smith, | 251 W. Townsend Rd. Twining, MI 48766 | ) ) ) |
| Vicki Steffen, | P.O. Box 116, Houghton Lake Heights, MI 48630 | ) ) ) |
| Lisa Swint, | 1012 W. Belmont Red Trl. San Tan Valley, AZ 85143 | ) ) ) |
| Christine M. Theile, | 501 Chesaning St. St. Charles, MI 48655 | ) ) ) |
| Barbara Ellen Vance, | 12966 Hawkins Rd. Burt, MI 48417 | ) ) ) |
| Barry Allen Vance, | 4953 Midnight Ln. Sarasota, FL 34235 | ) ) ) ) |

|  |  | ) |
|---|---|---|
| Bill L. Vance, | 380 N. Fenmore Rd. | ) |
|  | Merrill, MI 48637 | ) |
|  |  | ) |
| Brian Scott Vance, | 12966 Hawkins Rd. | ) |
|  | Burt, MI 48417 | ) |
|  |  | ) |
| Carol Wheaton, | 150 W. North St., Apt. 3P | ) |
|  | St. Charles, MI 48655 | ) |
|  |  | ) |
| Frank J. Wheaton, | 1717 Castle Rd. | ) |
|  | North Branch, MI 48461 | ) |
|  |  | ) |
| Jack G. Wheaton, | 3070 E. Verne Rd. | ) |
|  | Burt, MI 48417 | ) |
|  |  | ) |
| James J. Wheaton, | 10110 Frost | ) |
|  | Freeland, MI 48623 | ) |
|  |  | ) |
| James W. Wheaton, | 7751 Loud Dr. | ) |
|  | Oscoda, MI 48750 | ) |
|  |  | ) |
| John Wheaton, | 11069 Bell Rd. | ) |
|  | Burt, MI 48417, | ) |
|  |  | ) |
|  | Plaintiffs, | ) |
|  |  | ) |
| v. |  | ) |
|  |  | ) |
| RYAN ZINKE, in his official capacity as | | ) |
| Secretary of the Interior, | | ) |
|  |  | ) |
| JOHN TAHSUDA III, in his official capacity | | ) |
| as Acting Assistant Secretary for Indian | | ) |
| Affairs of the Department of the Interior, | | ) |
|  |  | ) |
| and | | ) |
|  |  | ) |
| BRYAN RICE, in his official capacity as | | ) |
| Director of Bureau of Indian Affairs, | | ) |
|  |  | ) |
|  | Defendants. | ) |
| _____ | | ) |

## INTRODUCTION

1.    Plaintiffs are Native Americans who have been illegally stripped of their tribal membership (*i.e.*, "disenrolled") by their Tribe, the Saginaw Chippewa Indian Tribe of Michigan (the "Tribe").

2.    Tribal membership is important to Plaintiffs for many reasons. Disenrollment stigmatizes Plaintiffs by denying their identity and their status as Tribe members.  It also deprives Plaintiffs of important economic benefits, including benefits funded by the Investment Fund created by statute to ensure that all members of the Tribe may share in the proceeds from federal payments to the Tribe to account for the taking of tribal land.

3.    The Saginaw Chippewa Indian Tribe of Michigan Distribution of Judgment Funds Act, Pub. L. No. 99-346, 100 Stat. 674 (1986) (the "Judgment Funds Act" or the "Act"), resolved a dispute over Tribal eligibility by requiring the Tribe permanently to grant tribal membership to Plaintiffs and forbidding the Tribe from discriminating against Plaintiffs in the future.  The ongoing disenrollment of Plaintiffs is a clear-cut violation of the Act and its antidiscrimination mandate.

4.    The Judgment Funds Act created the Investment Fund to ensure equal and fair distribution of the assets of the Investment Fund to all members of the Tribe.  Section 5(b)(2) of the Act assigns the Secretary of the Department of the Interior (the "Secretary") the duty to enforce the Act's requirements, including its enrollment and antidiscrimination provisions, through "action [the Secretary] may determine to be necessary and appropriate."  This statutory duty is reinforced by the Secretary's fiduciary obligation to enforce the Act consistent with the underlying trust duty to the Tribe and its members.

5.    Because of the Tribe's ongoing violations of these key provisions of the Act,

Plaintiffs submitted a Petition to the Department of the Interior on October 19, 2016, seeking enforcement of the Act. The Petition is entitled "Request for Assistance Pursuant to the Saginaw Chippewa Indian Tribe of Michigan Distribution of Judgment Funds Act, Pub. L. No. 99-346." The Petition urged the Secretary to enforce the Judgment Funds Act by (1) preventing the Tribe from continuing its ongoing, illegal disenrollment of Plaintiffs; and (2) directing the Tribe to reinstate or re-enroll the Plaintiffs that it had already disenrolled.

6. Plaintiffs' Petition urged the Secretary to take action as swiftly as possible to avoid the continued stigmatization of Plaintiffs and the interruption of the benefits to which they are entitled as Tribal members.

7. Despite multiple communications by Plaintiffs and their counsel urging the Secretary to act with dispatch, the Secretary has thus far taken no steps to halt the ongoing violations of the Judgment Funds Act, nor has the Secretary responded to Plaintiffs' Petition. The Secretary's inaction harms, and will continue to harm, Plaintiffs.

8. This action is brought to compel Secretary Zinke, Assistant Secretary Tahsuda, and Bureau of Indian Affairs Director Rice, to enforce the requirements of the Judgment Funds Act, and to compel defendants to respond to Plaintiffs' Petition without additional delay.

## JURISDICTION

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

## PARTIES

10. Plaintiffs are members of the Saginaw Chippewa Indian Tribe of Michigan who were properly enrolled in the Tribe because they are direct descendants of the historic Saginaw, Swan Creek, and Black River Bands (the predecessor Bands of which the Tribe is comprised) who are of at least one-quarter degree Indian blood. These membership requirements are

embodied in amendments to the Tribe's Constitution that were mandated by the Judgment Funds Act, which was enacted by Congress to, among other things, end disputes over the Tribe's membership. Plaintiffs have been illegally disenrolled from the Tribe and ask the Court to compel Defendants to take action as contemplated by the Act by requiring the Tribe to comply with the Act's mandates and restore their Tribal membership.

11.  All Plaintiffs were disenrolled by the Tribe in 2016 and 2017, in violation of the Judgment Funds Act.

12.  Defendant Ryan Zinke, Secretary of the Department of the Interior, is responsible for enforcing the requirements of the Judgment Funds Act. Defendant Zinke is sued in his official capacity.

13.  Defendant John Tahsuda, Acting Assistant Secretary of Indian Affairs of the Department of the Interior, is responsible for assisting Secretary Zinke in the enforcement of the requirements of the Judgment Funds Act. Defendant Tahsuda is sued in his official capacity.

14.  Defendant Bryan Rice, Director of the Bureau of Indian Affairs, is responsible for carrying out the federal responsibility to protect and improve the trust assets of American Indians, Alaska Natives, and Indian tribes, like those at issue here for Plaintiffs. Defendant Rice is sued in his official capacity.

## HISTORICAL AND FACTUAL BACKGROUND

### Creation of the Saginaw Chippewa Indian Tribe of Michigan

15.  From 1855 to the present day, the United States maintained relations with the Saginaw, Swan Creek, and Black River Bands ("Bands") as one Tribe, which is currently known as the Saginaw Chippewa Indian Tribe of Michigan.

16.  Treaties of 1855 and 1864 created a reservation for the Bands in Isabella County, Michigan ("Isabella Reservation"), though the vast majority of the descendants of the Bands did not reside there.

17.  From 1855 to 1937, the Tribe was the successor in interest to those three Bands, because its membership included all descendants of those Bands, regardless of whether those descendants lived within the boundaries of the Isabella Reservation.

18.  The Indian Reorganization Act of 1934 required that the Tribe enact a new Constitution, which was adopted in 1937 ("1937 Constitution").  With this 1937 Constitution, the present-day Tribe came into legal existence.

19.  The Tribe's draft of the 1937 Constitution was written to include all descendants of the Bands as members of the Tribe, regardless of where they were located.  Most of the descendants of those Bands were scattered across Michigan and did not live on the Isabella Reservation.

20.  Unfortunately, the Tribe's draft of the 1937 Constitution was heavily modified by an agent of the Commissioner of Indian Affairs, who improperly and illegally forced the Tribe to revise the 1937 Constitution to include a "residency requirement" for membership in the Tribe.

21.  The "residency requirement" for membership in the Tribe meant that only those members of the Bands who could lineally trace their Indian ancestry to an individual who appeared on one of three specific allotment rolls of the Isabella Reservation—those of 1883, 1885, and 1891—would be considered members of the Tribe.

22.  The Constitution's revision excluded eighty-five percent of the Bands' descendants from qualifying for membership in the Tribe.

4

23.   As a result of the Constitution's revision, prior to the enactment of the Judgment Funds Act, the Tribe's "membership" was vastly under-inclusive because it included only descendants of the Bands who met the "residency requirement."

**Award of Funds to the Descendants of the Bands for Lands Taken by the United States**

24.   Membership criteria for enrollment in the Tribe became a significant issue in the late 1970s and early 1980s, when the Department of the Interior began to determine the distribution of judgment funds that were awarded to the Tribe as compensation for lands taken by the United States prior to the creation of the Tribe as a legal entity.

25.   During the early 18th century and prior to the Bands' consolidation into an integrated Tribe, the Bands collectively entered into four treaties with the United States ceding certain of the Bands' land to the United States.

26.   In the 1970s, the Tribe was awarded money judgments by the Indian Claims Commission ("ICC") and the Court of Claims.   These judgments were allocated in four "Dockets" before the Court of Claims: Dockets 13-E, 13-F, 57, and 59.   Docket 13-E dealt with lands ceded by the Treaty of July 4, 1805.   Docket 13-F dealt with lands ceded by the Treaty of September 29, 1817.   Docket 57 dealt with lands ceded by the Treaty of 1819.   Docket 59 dealt with lands ceded by the Treaty of November 17, 1807.

27.   Before any of these funds could be disbursed to the Tribe, Congress and the Secretary were required by statute, Indian Judgment Funds Distribution Act, Pub. L. No. 93-134, 87 Stat. 466 (1973), to approve the plans for the distribution of the judgment funds.

28.   The first plan was drafted for judgment funds from Docket 57, which related to the 1819 treaty and totaled $16,786,642.09.

29.   Prior to finalizing the plan, the Department of the Interior conducted extensive

research and prepared a report (the "1976 Report") to ensure that the funds from the Docket 57 judgment would be distributed to the proper recipients.

30.   The 1976 Report concluded that the Tribe, as constituted by the amended 1937 Constitution, improperly excluded many descendants of the Bands who entered into the Treaty of 1819, which was associated with judgment funds from Docket 57.

31.   The 1976 Report determined that a substantial number of descendants of the Bands who did not qualify for membership in the Tribe under the 1937 Constitution were legally entitled to participate in the judgment fund for Docket 57 because they could trace their Indian ancestry to one of the three Bands—the Saginaw, Swan Creek, and Black River Bands—who had been parties to the 1819 treaty.

32.   Accordingly, the Department of the Interior recognized that awarding the entire judgment fund from Docket 57 to the Tribe would be improper.  Instead, the plan approved by the Department of the Interior, and ultimately implemented, included a distribution of $13,168,617.12 of the Docket 57 judgment funds, or about seventy-nine percent of the total judgment, to 3,243 descendants of the Bands who were excluded from membership in the Tribe because of the amended 1937 Constitution.

33.   In 1983, the Department of the Interior conducted additional research and prepared another report (the "1983 Report") to ensure that the judgment funds from Dockets 13-E, 13-F, and 59 would be distributed to the proper recipients.

34.   Like the 1976 Report, the 1983 Report demonstrated the Tribe's membership did not include all of the eligible descendants of the Bands who had entered into the treaties associated with Dockets 13-E, 13-F, and 59.  Once again, the 1983 Report found that a substantial number of descendants of the Bands who did not qualify for membership in the

Tribe under the 1937 Constitution were nonetheless entitled to participate in the judgment funds for those Dockets because they could trace their Indian ancestry to one of the three Bands.

35.   As a result, the Department of the Interior's plan proposed that the judgment funds from Dockets 13-E, 13-F, and 59 be distributed according to the same formula used to distribute Docket 57 funds, with about seventy-nine percent to be distributed to descendants of the Bands who were not members of the Tribe under the restrictive membership definition of the 1937 Constitution.

**Enactment of the Judgment Funds Act and Enrollment of Plaintiffs**

36.   The Tribe opposed the Department of the Interior's plan for the distribution of the judgment funds from Dockets 13-E, 13-F, and 59 because the distribution to descendants who were not "members" under the 1937 Constitution would significantly reduce the share of the distribution to Tribe members who resided on the reservation.

37.   To counter the Department of the Interior's proposal, the Tribe urged its own distribution plan, which would allocate all of the three Dockets' judgment funds for economic and community development for the Tribe.  No per capita payments would be made to either tribal members or the descendants of the Bands who were not members of the Tribe under the 1937 Constitution.

38.   Congress then intervened to resolve the dispute out of concern that the descendants of the Bands who were excluded from membership in the Tribe would be discriminated against by the Tribe in the distribution of any funds from the Docket judgments.

39.   To settle the matter once and for all, Congress enacted the Judgment Funds Act in 1986.

40.   The Judgment Funds Act set forth a number of requirements that are relevant to Plaintiffs' action.  Most important, as a condition precedent to participating in any distribution of funds, the Tribe was required to amend the membership provisions of its Constitution to: (a) eliminate the "reservation residency" requirement for membership, and (b) open enrollment for an eighteen-month period to allow all descendants of the three Bands who were of at least one-quarter degree Indian blood to become members of the Tribe.

41.   In particular, Section 4(a) of the Judgment Funds Act referenced the tribal Resolution, "resolution L and O-03-85," through which the Tribe was required to amend its Constitution to allow descendants of the three Bands who were of at least one-quarter degree Indian blood to apply for membership in the Tribe.  Section 5(a) established the Tribe's adoption of such constitutional amendments as a condition precedent to the Secretary's obligation to transfer the judgment funds for Dockets 13-E, 13-F, and 59 to the Tribe.

42.   Section 3 established the Investment Fund, which was, among other things, comprised of the judgment funds for Dockets 13-E, 13-F, and 59.  Consistent with Section 5(a), this section provides that "the income of the Investment Fund" may not be distributed until "18 months after the date on which the amendments to the constitution of the tribe referred to in section 4(a) are adopted and ratified."

43.   The Judgment Funds Act also assigns enforcement responsibilities and duties to the Secretary.  Specifically, Section 5(b)(2) mandates that the Secretary "enforce the requirements of [the Judgment Funds Act]," through "such action [he or she] may determine to be necessary and appropriate to enforce the requirements of this Act."  Section 5(b)(2) also contemplates that the Secretary will "assume administration of the Investment Fund if it is

8

Case 1:18-cv-00891   Document 1   Filed 04/16/18   Page 14 of 24

determined that the Tribal Council has materially failed to administer the Investment Fund in accordance with the requirements of [the] Act." This duty is rooted not just in the language of the Act, but also in the fiduciary obligation of the Secretary to enforce the Act consistent with the Secretary's underlying trust duty to the Tribe and its members.

44. Finally, the Act contains a nondiscrimination provision. Section 9 prohibits the Tribe from using the proceeds of the Investment Fund in a way that would discriminate against "individuals who become members of the tribe after the date on which the amendments to the constitution of the tribe referred to in section 4(a) are adopted and ratified." Any distribution by the Tribe that violates Section 9's nondiscrimination mandate is not an "administrat[ion] of the Investment Fund in accordance with the requirements of this Act."

45. In the wake of the Act's passage, the Tribe demonstrated that it understood its obligation under the Judgment Funds Act. On November 4, 1986, in furtherance of the statutory mandate of Section 4(a), the Tribe amended its Constitution to open enrollment to all descendants of the historic Saginaw, Swan Creek, and Black River Bands of at least one-quarter degree Indian blood—regardless of whether they could satisfy the "residency requirement"—who filed applications within the open enrollment period. The Tribe also obligated itself to abide by the Act's antidiscrimination provision, which forbids the Tribe from disenrolling these members.

46. The eighteen-month open enrollment period began on November 5, 1986, and closed on May 4, 1988 (the "Judgment Funds Act Enrollment Period"), during which time descendants of the Bands, including Plaintiffs, could apply for membership.

47. All Plaintiffs are among the approximately eight hundred descendants of the Bands who properly applied for, and received membership in, the Tribe during the Judgment Funds

Act Enrollment Period, or their later born children of at least one-quarter Indian blood.

48.  On information and belief, the judgment funds were transferred to the Tribe pursuant to Section 5(a) in 1987, and the Tribe has managed and used the Investment Fund free of the Secretary's oversight since that time.

49.  Because the Tribe remains legally obligated by the Judgment Funds Act and the 1986 constitutional amendments to maintain the enrollment and membership status of such persons, the failure of the Secretary to enforce the provisions of the Act reinstitutes and perpetuates exactly the discrimination against Plaintiffs that the Act was enacted to prevent.

50.  In addition, under the Judgment Funds Act, the Tribe legally obligated itself through the 1986 constitutional amendments to enroll the later-born children of such descendants who are at least one-quarter degree Indian blood.  Enforcement of the Judgment Funds Act requires the Secretary to ensure that the Tribe maintains the enrollment and membership status of such persons.

## RECENT DISENROLLMENT PROCEEDINGS

51.  Between 1986 and 1996, the Tribe reinstated Plaintiffs into the Tribe and made no effort to contest the legitimacy of Plaintiffs' membership in the Tribe.  Since then, the Tribe made several attempts to disenroll Plaintiffs, all of which were ultimately unsuccessful until the present round of disenrollments, which began in 2015.

52.  In 1996, the Tribe undertook its first attempts to disenroll hundreds of tribal members enrolled during the Judgment Funds Act Enrollment Period, including some of the Plaintiffs.   The Tribe did so by amending its enrollment ordinance to allow for the disenrollment of members on the basis of "erroneous enrollment."

53.  Disenrollment proceedings were held before the Tribe's administrative department

10

in charge of membership matters and before the tribal courts.  In these proceedings, the Tribe argued that tribal members enrolled during the Judgment Funds Act Enrollment Period were wrongfully enrolled because they could not lineally trace their Indian ancestry to an individual who appeared on one of the three specific allotment rolls (from 1883, 1885, and 1891) of the Isabella reservation, even though they were, in fact descendants of the historic Saginaw, Swan Creek, and Black River Bands and of at least one-quarter degree Indian blood.

54.   These efforts to disenroll were unsuccessful, and Plaintiffs were able to maintain their membership in the Tribe.

55.   Subsequently, the Tribe made other attempts to disenroll tribal members who were enrolled during the Judgment Funds Act Enrollment Period, including some of the Plaintiffs.

56.   The Tribe ultimately halted an early 2000s effort to disenroll Plaintiffs, reaffirming their membership in March 2009, when the Tribal Council directed its legal department to dismiss, with prejudice, thirteen pending disenrollment proceedings, including the cases of some of the Plaintiffs (the "2009 Directive").   That was not to last, however.

57.   In 2011, the Tribe elected a new Tribal Council, which amended one of the Tribe's membership-related ordinances, Ordinance 14 ("Ord. 14"), in another effort disenroll tribal members enrolled during the Judgment Funds Act Enrollment Period.  This effort targeted those tribal members whose disenrollment proceedings had not yet been dismissed with prejudice per the Tribal Council's 2009 Directive.

58.   This time, the Tribe's leadership succeeded in disenrolling members.  In a series of proceedings before the Tribe's administrative department in charge of membership matters and the tribal courts that began in 2011 and culminated in April 2015, individuals whose tribal status had been restored as a result of the Judgment Funds Act's antidiscrimination mandate

11

had their membership status revoked.  The tribal courts did not acknowledge, let alone address, the obligations imposed on the Tribe by the Judgment Funds Act.

59.  Building off of that victory, in May 2014, the Tribe again amended Ord. 14 to provide a procedure to reopen disenrollment cases previously dismissed "with prejudice."

60.  After the amendment to Ord. 14 and the conclusion of the proceedings that began in 2011, the Tribe moved to reopen the disenrollment cases that were dismissed with prejudice in 2009, including Plaintiffs' cases.  Plaintiffs challenged the Tribe's authority to reopen final judgments, but were unsuccessful.  As a result, Plaintiffs were subject to disenrollment proceedings notwithstanding the contrary requirements of the Judgment Funds Act and the previous entry of a final judgment holding that they are, in fact, members of the Tribe.

**SUBMISSION OF THE PETITION
AND THE DEPARTMENT OF THE INTERIOR'S INACTION**

61.  Because of the Tribe's ongoing violations of the Judgment Funds Act, in 2015, Plaintiffs' counsel contacted Bureau of Indian Affairs ("BIA") officials and urged them to take action to force the Tribe to cease immediately its illegal disenrollment proceedings.

62.  The BIA took no action as result of these communications.  As a result of BIA's inaction, the Tribe continued to disenroll Plaintiffs, notwithstanding the antidiscrimination mandate of the Judgment Funds Act and the Judgment Funds Act's flat prohibition against disenrollment.

63.  To force a response from BIA, on October 19, 2016, Plaintiffs filed a formal Petition with the Department of the Interior asking agency officials, including those in the BIA, to perform their duty as mandated by the Judgment Funds Act.  The Petition explained that, under the Judgment Funds Act and the Department of the Interior's longstanding fiduciary duty to Plaintiffs, the Department of the Interior was required to take action promptly to force

the Tribe to cease and desist from unlawfully disenrolling Tribe members who were entitled to Tribal membership under the Judgment Funds Act.  The Petition also asked the Department of the Interior to compel the Tribe to comply with the dictates of the Judgment Funds Act by re-enrolling those members who were wrongfully disenrolled by the Tribe.

64.  Since filing the Petition, Plaintiffs have repeatedly communicated with Department of the Interior officials, including Defendants, urging them to take the measures laid out in the Petition, or, at the very least, to respond to the Petition.  To date, Defendants have taken no action on the Petition, and no action to enforce the clear-cut requirements of the Judgment Funds Act.

65.  As a result of Defendants' failure to enforce the antidiscrimination mandates of the Judgment Funds Act, Plaintiffs have been harmed, and continue to be harmed, by their disenrollment.  Plaintiffs have suffered serious stigmatic injury by being expelled from the Tribe and thus denied their Tribal heritage and identity.  Plaintiffs have also been illegally denied Tribal resources, including provision of health care services, per capita payments estimated at over $60,000 per year, subsidized educational benefits available to tribal members, and their right to vote on tribal matters.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF DEFENDANTS' MANDATORY DUTY TO ENFORCE THE**
**JUDGMENT FUNDS ACT**

66.  The allegations contained in paragraphs 1 through 65, above, are repeated and incorporated as though fully set forth herein.

67.  Congress enacted the Judgment Funds Act to settle once and for all issues regarding membership in the Tribe. Section 9 of the Act, entitled "Nondiscrimination,"

provides that "[a]ny distribution or expenditure of the income of the Investment Fund [created to dispose of the assets of the Dockets] . . . shall not discriminate against—(1) individuals who become members of the tribe after the date on which the amendments to the constitution of the tribe referred to in section 4(a) are adopted and ratified . . . ."

68.  The Tribe initially complied with this mandate. Plaintiffs are among the approximately eight hundred descendants of the Bands who properly applied for and received membership in the Tribe during the open enrollment period approved by the 1986 constitutional amendments and referred to in Section 9(a)(1).

69.  In 2016, the Tribe began to violate Section 9's mandate against discriminating against Tribal members who were enrolled pursuant to the requirements of the Judgment Funds Act by disenrolling them from the Tribe.

70.  The Tribe's disenrollment of Plaintiffs are unambiguous violations of Sections 4 and 9 of the Judgment Funds Act.  Section 4(a)'s reference to the Tribal Council's "resolution L and O-03-85" was a commitment by the Tribe to amend its Constitution to guarantee all descendants of the Bands who were of one-quarter Indian blood—regardless of the residence of the Indian ancestor to which they could trace their lineage—had full membership in the Tribe and thus could share equally with regard to distributions under the Judgment Funds Act. And Section 9, the Act's nondiscrimination mandate, reaffirms that the Tribe may not discriminate against Tribal members who were enrolled pursuant to the requirements of the Judgment Funds Act.

71.  Section 5(b)(2) of the Judgment Funds Act imposes a mandatory duty on the Secretary of the Interior to "enforce the requirements of this Act" when, as here, "the Tribal Council has materially failed to administer the Investment Fund in accordance with the

14

requirements of this Act."

72.    Defendants have been on notice since October 2016, if not before, that the Tribe was refusing to "administer the Investment Fund in accordance with the requirements of the Act."

73.    The Administrative Procedure Act, 5 U.S.C. § 706(1), provides that a "reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed." Defendants have unlawfully withheld and unreasonably delayed carrying out their duties under the Judgment Funds Act to protect Plaintiffs from the illegal, discriminatory acts of the Tribe in violation of Section 9 of the Act, and from the Tribe's willful failure to "administer the Investment Fund in accordance with the requirements of [the] Act."

74.    Defendants' failure to carry out these duties has caused and will continue to cause substantial harm to Plaintiffs.

75.    This Court should enter declaratory and injunctive relief to remedy Defendants' failure to comply with the requirements of the Judgment Funds Act.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF DEFENDANTS' DUTIES UNDER THE ADMINISTRATIVE**
**PROCEDURE ACT TO ACT REASONABLY AND NOT ABUSE THEIR DISCRETION**

76.    The allegations contained in paragraphs 1 through 65, above, are repeated and incorporated as though fully set forth herein.

77.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), empowers the Court to "hold unlawful" any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

78.    As set forth above, Defendants have failed to carry out their duties under the Judgment Funds Act to protect Plaintiffs from the illegal, discriminatory acts of the Tribe in

violation of Section 9 of the Act, and from the Tribe's willful failure to "administer the Investment Fund in accordance with the requirements of [the] Act."

79.   Defendants' failure to act is arbitrary, capricious, an abuse of discretion, and is not otherwise in accordance with the law.

80.   Defendants' failure to take action has caused and will continue to cause substantial harm to Plaintiffs.

81.   This Court should enter declaratory and injunctive relief to remedy Defendants' failure to comply with the requirements of the Judgment Funds Act.

## THIRD CLAIM FOR RELIEF
## VIOLATION OF DEFENDANTS' DUTY TO RESPOND TO PLAINTIFFS' PETITION "WITHIN A REASONABLE TIME"

82.   The allegations contained in paragraphs 1 through 65, above, are repeated and incorporated as though fully set forth herein.

83.   The Administrative Procedure Act directs agencies to give "due regard for the convenience and necessity of the parties" and that "within a reasonable time, each agency shall proceed to conclude a matter presented to it."  5 U.S.C. § 555(b).  The Act further provides that a reviewing court "shall" compel agency action "unreasonably delayed."  *Id*. § 706(1).

84.   Plaintiffs submitted a formal Petition to the Defendants on October 16, 2016 that laid out the Tribe's multiple and deliberate violations of the Judgment Funds Act and the need for urgent agency action.

85.   By any measure, Defendants have not acted with "due regard" for the necessity of the parties, nor have Defendants sought to conclude the "matter presented to" the Agency within "a reasonable time."

86.   As a result of Defendants' actions, Plaintiffs have suffered, and continue to suffer,

16

injury.

87.   Defendants' failure to take action has caused and will continue to cause substantial harm to Plaintiffs.

88.   This Court should enter declaratory and injunctive relief compelling Defendants to respond to Plaintiffs' Petition forthwith.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter an Order:

A.   Declaring that Defendants Zinke, Tahsuda and Rice have failed to carry out their mandatory duties to enforce the Judgment Funds Act's requirements for fair and nondiscriminatory treatment of tribal descendants who were enrolled pursuant to the Judgment Funds Act;

B.   Requiring Defendants to take action, without further delay, to halt the Tribe's illegal "disenrollment" of tribal members who are being stripped of their membership in the Tribe because they were enrolled pursuant to the Judgment Funds Act;

C.   Requiring Defendants to take action, without further delay, to require the Tribe to restore Plaintiffs to their Tribal membership as contemplated by the Judgment Funds Act;

D.   Requiring Defendants to take action, without further delay, to restore to Plaintiffs any benefits that would have accrued to them by virtue of Tribal membership, that were denied to them because of their illegal disenrollment;

E.   Requiring the Defendants to take action, without further delay, to enforce the Judgment Funds Act in a manner consistent with their fiduciary duty under the Act and consistent with their trust obligation to the Tribe and its members, to restore Plaintiffs' Tribal membership, as contemplated by the Act;

F.   In the alternative, declaring that Defendants' failure to respond to Plaintiffs' October 2016 Petition constitutes agency action "unreasonably delayed," and not concluded in a "reasonable time;"

G.   Requiring Defendants to respond, without further delay, to the October 2016 Petition ;

H.   Awarding Plaintiffs their costs and attorneys' fees in this action; and

I.   Granting Plaintiffs such other and further relief as the Court deems just and proper.

/s/ Gerald Torres
Gerald Torres (D.C. Bar No. 965590)
Cornell Law School
314 Myron Taylor Hall
Ithaca, NY 14853-4901
(607) 254-1630
gt276@cornell.edu

/s/ Michael D. Sliger
Michael D. Sliger (N.Y. Bar No. 4662748)
Cornell Law School
Law Offices of Michael D. Sliger, Esq.
1177 Avenue of the Americas, 5th Floor
New York, NY 10036
(810) 394-0072
msliger@mdsligerlaw.com

*Attorneys for Plaintiffs*

/s/ Hope M. Babcock
Hope M. Babcock (D.C. Bar No. 14639)
Institute for Public Representation
Georgetown University Law Center
600 New Jersey Avenue, NW
Washington, DC 20001
(202) 662-9549
babcock@georgetown.edu

*Of Counsel*

Date: April 16, 2018